# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **MAHERSALA HOWARD and** ) | |
| **LORETTA WASHINGTON,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Civil Action File No.: _____** |
| **v.** ) | |
| ) | **JURY TRIAL DEMANDED** |
| **CITY OF COLLEGE PARK,** ) | |
| **GEORGIA,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |

## COMPLAINT

Plaintiffs **Mahersala[1] Howard** ("Ms. Howard" or "Plaintiff Howard") and **Loretta Washington** ("Ms. Washington" or "Plaintiff Washington") (collectively referred to as "Plaintiffs") bring this civil employment action for relief and damages against Defendant **City of College Park, Georgia** ("College Park" or "Defendant") based on the following factual allegations and causes of action.

---

[1] Ms. Howard's given name is Mahersalalhashbaz but she routinely uses the shortened version "Mahersala".

1

## NATURE OF THE ACTION

1.    This action to correct unlawful disability discrimination by a municipality principally arises under the Americans with Disabilities Act ("ADA"), 42 U.S.C.A. § 12112(a). Plaintiffs, both former city employees, allege that College Park terminated each of them based on their disclosure of ADA qualifying mental health impairments. Each Plaintiff also asserts one additional claim: Ms. Washington alleges retaliation under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C.A. § 2000e-3(a); and Ms. Howard brings a claim of interference under the Family and Medical Leave Act ("FMLA"), 29 U.S.C.A. § 2615(a)(1).   Plaintiffs seek economic damages of back pay, front pay, and lost benefits. Additionally, Plaintiffs seek compensatory damages for emotional distress and mental anguish as well as their attorneys' fees and costs of litigation. Plaintiffs also petition the court for injunctive and declaratory relief as appropriate.

## THE PARTIES

2.    Plaintiff Howard is a resident of the state of Georgia, and during the time of the relevant events alleged in this complaint, she was employed as a specialist in College Park's communications department.

2

3.    Plaintiff Washington is a resident of the state of Georgia, and during the time of the relevant events alleged in this complaint, she was employed as City Engineer of College Park.

4.    College Park is a municipality of approximately 14,000 citizens located near the Hartsfield-Jackson Atlanta International Airport in Fulton County, Georgia. It is an entity subject to suit under the ADA, Title VII, and the FMLA.

## PERSONAL JURISDICTION

5.    College Park may be served with process under O.C.G.A. § 9-11-4(e)(5), upon the chairman of the City Council, the Mayor, the City Manager, or an agent authorized by appointment to receive service of process. Service may be effectuated on said individuals at College Park's City Hall address at 3667 Main St., College Park, Georgia 30337.

## SUBJECT-MATTER JURISDICTION AND VENUE

6.    Jurisdiction of this court is invoked pursuant to 28 U.S.C.A. §§ 1331 and 1343.

7.    Venue is proper in this district and division under 28 U.S.C.A. § 1391(b)(1)-(2), as Defendant resides in and conducts business in this district and division and the acts or omissions giving rise to the claim occurred in the same venue.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.     Ms. Washington filed a charge of discrimination against College Park with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 410-2021-04308, on July 9, 2021.

9.     Ms. Howard filed a charge of discrimination against College Park with the EEOC, Charge No. 41-2022-07291, on October 28, 2022.

10.    Ms. Washington subsequently received a right-to-sue letter from the EEOC on February 9, 2023.  A copy is attached as Exhibit A.

11.    Ms. Howard subsequently received a right-to-sue letter from the EEOC on March 13, 2023.  A copy is attached as Exhibit B.

12.    Ms. Howard and Ms. Washington timely file this action within 90 days of receiving their respective right-to-sue letters, and all administrative remedies have been exhausted prior to the filing of this civil action.

## FACTUAL ALLEGATIONS

13.    Major depressive disorders, including generalized anxiety and stress, afflict roughly 9.5% of the U.S. adult population annually according to recent data from the National Institute of Mental Health Disorders.  They are highly

4

manageable conditions that still create the risk of debilitating physical and psychological effects.

14.     The ADA specifically protects persons with mental health impairments like depression from discrimination or mistreatment on the job. 42 U.S.C.A. § 12102(1)(A).

15.     In contrast with numerous municipalities in Georgia and around the United States, College Park's municipal government has declined to take proactive steps to educate its management-level personnel about the implications of depressive disorder among its employees. The city does not provide its administrators with training manuals or educational material about how to recognize or address evidence of major levels of depression in its workforce.

16.     Given the absence of active education about the perils of mental health issues in the workplace, it is commonplace in College Park's municipal government that signs of mental health struggles are dismissed by managers as "attitude problems" or as a sign that an employee is incapable of being effective at their job.

17.     While College Park provides an Employee Assistance Program ("EAP") that includes resources for coping with mental health challenges, city officials are prone to misunderstand the EAP. On occasion, managers have ordered

employees to seek EAP assistance as a condition of continued employment, and in some cases, they have sought to obtain information about the status of EAP assistance, a flagrant violation of the principle that the EAP should be a confidential resource.

18.    College Park has also failed to educate its senior level administrators that employees with mental health conditions are entitled to statutory rights including FMLA leave, or that they are fully protected by the ADA. The inevitable result is that such employees are either unfairly scrutinized, or that the city falls well short of its legal obligations to protect municipal workers struggling with conditions like anxiety and depression.

**Ms. Washington's claims**

19.    Ms. Washington was hired in March 2020 as College Park's City Engineer, a senior-level department head position in city government.

20.    During the first nine months of her employment, Ms. Washington confronted various high-stress challenges. In the summer of 2020, she reported the city's Special Projects Manager, Jackson Myers ("Myers"), for sexually harassing behavior, including presenting her a pair of tight-fitting shorts as an ill-considered prank, and she encountered what she perceived as a pattern of retaliation and

interference from Myers after he was admonished by the city manager for inappropriate behavior.

21.    For example, Myers circumvented Ms. Washington's role as City Engineer by authorizing permits without her approval; on other occasions, he pressed her to perform tasks outside the scope of her authority, which she regarded as a ploy to put her at risk of being fired. The interactions between Ms. Washington and Myers were tense, and sometimes included raised voices or openly confrontational behavior from Myers.

22.    In December 2020, Ms. Washington copied Director of Human Resources and Risk Management Dwight Baker ("Baker") and Interim City Manager Mercedes Miller ("Miller") on an email to the elected City Council and the Mayor complaining about what Ms. Washington perceived as escalating retaliatory behavior by Myers.  Ms. Washington also informed Baker and Miller that she was increasingly struggling with stress and anxiety due to the tensions at work.

23.    In the same December 2020 time frame, Ms. Washington began receiving weekly counseling from the city's EAP, and she reported the increased pressure she was under to her doctor, who recommended that she take a medical leave of absence as a result of her condition. Her approved leave lasted from

December 20, 2020, to January 4, 2021, and it was extended by her doctor twice more, to January 12, 2021.

24.    Despite being well aware that she was on a medical leave, Baker contacted Ms. Washington on multiple occasions by phone and email in the first days in January 2021 to demand that she follow College Park's protocol by immediately initiating a formal written grievance against Myers while she was still on leave. Baker told her that if she failed to follow up on her written complaint to city leaders with a grievance, the city would conclude that her complaint was not made in good faith and the complaint would be ignored.

25.    At least twice, Ms. Washington responded that she was struggling with stress and a lack of sleep and was focusing on recovering her health and as a result was incapable of preparing an official grievance document, to which Baker responded that she could consider her complaint dismissed "effective immediately."

26.    On January 13, 2021, on her first day back in the office, Ms. Washington was summoned to meet with Miller and Baker. Miller immediately questioned her about the duration of her three-week leave and informed her that the city had made the decision to terminate her employment.

27.    In lieu of termination, Ms. Washington was offered the option of an involuntary resignation, which she signed the same day, January 13, 2021.

28.    Ms. Washington had described the state of her mental health to senior College Park officials on at least three sets of occasions in the three weeks prior to her notice of termination: her disclosure to Baker and Miller in December that she was experiencing extreme distress and anxiety; her emails and phone conversations with Baker in January about her continuing struggles while on leave; and a January 11 email to Baker and Miller that her return would be delayed by a few days because "I am still experiencing symptoms of acute stress," accompanied by a note from her doctor describing her acute stress.

29.    Prior to Ms. Washington's sudden notice of termination on January 13, 2021, she had not been informed that she was in danger of termination, nor had she been subject to any form of disciplinary or corrective action.

**Ms. Howard's claims**

30.    Ms. Howard has worked for College Park since 2016, and beginning in 2019, she was assigned to various roles in the communications department. In 2018 or 2019, Ms. Howard was diagnosed with depression and anxiety, conditions she has successfully managed over the past five years.

31.    For a brief stint from March to July 2022, Ms. Howard was Interim Director of Communications. After another candidate, Jamesia Harrison ("Harrison"), was selected to lead the communications department, Ms. Howard was reassigned to the role of communications specialist.

32.    Ms. Howard acknowledges that during the summer of 2022, her difficulties with anxiety increased. Roughly a month into her new role, Ms. Howard was presented with a 30-day review that she felt unjustifiably criticized her performance at work.

33.    Ms. Howard was alarmed by the review, and during a meeting with Harrison in August 2022, she became visibly emotional and began to cry. At some point in August or September, she experienced a panic attack in the presence of a coworker while on city property.

34.    During the August meeting  in which Ms. Howard cried, she disclosed to Harrison that she had a history of anxiety and depression.

35.    On September 15, 2022, Ms. Howard filed a grievance against Harrison alleging mistreatment and bullying.

36.    College Park's response to Ms. Howard's complaint was a textbook example of reprisal. Within a week, on September 22, Harrison and a member of the Human Resources team, Christa Gilbert ("Gilbert"), notified Ms. Howard that

she was being placed on a performance improvement plan.  In addition, Gilbert told Ms. Howard that she would be required to begin mandatory counseling with the EAP.

37.    Gilbert also directly told Ms. Howard that the city would receive a report of Ms. Howard's sessions with the EAP, which would flout the fundamental principle that the contents of an employee's participation in an EAP counseling program should be shielded from her supervisors.

38.    On the afternoon of September 22, Ms. Howard reported the conversation to Baker, who not only reinforced the instruction to receive mandatory counseling but also added that Ms. Howard would be terminated if she did not consent to participate. Baker added that EAP counseling was in order because "something is going on with you," a hint that College Park officials perceived Ms. Howard's mental condition as a liability.

39.    Despite mandating EAP counseling based on a perception that Ms. Howard was experiencing mental health challenges, College Park's HR department pointedly declined to apprise Ms. Howard that her condition entitled her to additional statutory rights under the FMLA, including (1) up to 12 weeks of leave for a serious medical condition, 29 U.S.C.A. § 2612(a)(1); and (2) the right to be

restored to her position under the completion of her leave. 29 U.S.C.A. § 2614(a)(1).

40.     While Ms. Howard had exhausted some portion of her FMLA leave for injuries from a car accident, she had approximately nine weeks of accrued FMLA eligibility remaining the September/October 2022 time frame.

41.     Ms. Howard's sessions with the EAP unfolded over the next month. After three city-paid sessions, Ms. Howard elected to continue weekly treatment with the EAP counselor and to pay for therapy out of her own funds.

42.     Ms. Howard's EAP therapist diagnosed her with clinical depression and anxiety, related in major part to workplace pressures.

43.     While the extent to which College Park officials were apprised of Ms. Howard's EAP diagnosis is unclear, at least one city official sought to inquire about the results of her sessions. The aforementioned Jackson Myers, who in July 2022 was named Interim City Manager, engaged Ms. Howard's EAP counselor in a discussion about the status of her therapeutic sessions with Ms. Howard.

44.     As Ms. Howard continued her EAP sessions, she noticed that Harrison began to exclude her from department meetings to which she had routinely been invited and that fell squarely within her job duties. Harrison also made no attempt to engage Ms. Howard on whether she was meeting the parameters described in the

performance improvement plan, a departure from the city's normal practice for such plans.

45.    On October 28, 2022, approximately a month after Ms. Howard began her weekly sessions, Baker and Harrison informed her that she was being terminated on the vague grounds that she was not "meeting the duties of her job description."

46.    After Ms. Howard's termination, at least one senior College Park official openly disparaged her mental health condition. Baker told a College Park police officer that the city believed Ms. Howard posed a risk of violence, fabricating a narrative that she had behaved erratically on city premises after her firing.

### College Park's liability

47.    College Park's conduct toward Ms. Washington and Ms. Howard reflects discrimination based on their mental health and the city's perception that their struggles made them defective in some manner.

48.    The city's unlawful treatment of both women also exacerbated their emotional distress by adding the trauma of unemployment to the profound depression they were already experiencing.

49.     College Park's failure to advise Ms. Howard of her entitlement to leave and job protection under the FMLA constituted interference with her rights under the statute, and consequently, Ms. Howard suffered harm in that she was denied an opportunity to take leave in September and October 2022 that would have shielded her from being placed on a performance improvement plan or being terminated.

50.     In Ms. Washington's case, her termination within approximately a month of a complaint of retaliatory mistreatment by a city employee she accused of harassing behavior also constitutes retaliation under Title VII.

51.     Both plaintiffs have suffered economic loss. Ms. Washington, once the senior engineering official for an Atlanta metro area municipality, was out of work for a year after her forced resignation. Ms. Howard has taken a pay cut.

## CAUSES OF ACTION
### COUNT I
**Plaintiff Loretta Washington**

**(Disability discrimination in violation of the Americans with Disabilities Act)**

52.     Plaintiff Washington incorporates by reference the preceding paragraphs of this complaint as though set forth fully and separately herein.

53.    Plaintiff Washington is an individual protected by the ADA, in that she has a mental impairment that substantially limits a major life activity. She suffers from a depressive disorder and acute anxiety.

54.    Plaintiff Washington could have performed the essential functions of her job with or without reasonable accommodation.

55.    Defendant College Park subjected Plaintiff Washington to unlawful termination based on her mental health and the perception of city officials regarding her mental health. 42 U.S.C.A. § 12112(a).

56.    As a result of College Park's disability-based discrimination, Plaintiff Washington has suffered monetary damages, including but not limited to back pay and front pay; loss of future benefits; and noneconomic damages, including emotional distress, humiliation, embarrassment, mental anguish, and reputational stigma.

## COUNT II
### Plaintiff Mahersala Howard
### (Disability discrimination in violation of the Americans with Disabilities Act)

57.    Plaintiff Howard incorporates by reference the preceding paragraphs of this complaint as though set forth fully and separately herein.

58.    Plaintiff Howard is an individual protected by the ADA, in that she has a mental impairment that substantially limits a major life activity. She suffers from a depressive disorder and acute anxiety.

59.    Plaintiff Howard could have performed the essential functions of her job with or without reasonable accommodation.

60.    Defendant College Park subjected Plaintiff Howard to unlawful termination based on her mental health and the perception of city officials regarding her mental health. 42 U.S.C.A. § 12112(a).

61.    As a result of College Park's disability-based discrimination, Plaintiff Howard has suffered monetary damages, including but not limited to back pay and front pay; loss of future benefits; and noneconomic damages, including emotional distress, humiliation, embarrassment, mental anguish, and reputational stigma.

## COUNT III
### Plaintiff Mahersala Howard
### (Leave interference in violation of the Family and Medical Leave Act)

62.    Plaintiff Howard incorporates by reference the preceding paragraphs of this complaint as though set forth fully and separately herein.

63.    Plaintiff Howard was an eligible employee under the FMLA in that at the time relevant to this complaint, she had been employed by College Park for

more than 12 months, or 1250 hours during the previous 12 month period. 29

U.S.C.A. § 2611(2)(A).

64.    College Park was an FMLA covered employer in that the city is a

public agency 29 U.S.C.A. § 2611(4)(A)(iii)-(B).

65.    Despite its belief that Plaintiff Howard was experiencing a serious

mental health condition, College Park neglected to advise Plaintiff Howard of her

eligibility for additional protected leave time and her rights under the FMLA.

66.    College Park's failure to provide Plaintiff Howard notice of her

FMLA eligibility and rights caused her harm by denying her the opportunity to

take leave that would have protected her job at the time she was eventually

terminated.

67.    College Park's conduct interfered with the exercise of Plaintiff

Howard's rights provided under the FMLA. 29 U.S.C.A. § 2615(a)(1).

68.    As a result of College Park's interference with her FMLA rights,

Plaintiff Howard suffered monetary damages including lost back pay and front pay.

## COUNT IV
### Plaintiff Loretta Washington
### (Retaliation in violation of Title VII)

69.    Plaintiff Washington incorporates by reference all the preceding paragraphs of this complaint as though set forth fully and separately herein.

70.    Plaintiff Washington engaged in protected activity by opposing acts or practices made unlawful under Title VII, in that she made internal complaints of retaliatory mistreatment by a fellow municipal employee.

71.    College Park retaliated against Plaintiff Washington for engaging in protected activity by terminating her, in violation of 42 U.S.C.A. § 2000e-3(a).

72.    As a result of College Park's retaliatory conduct, Plaintiff Washington has suffered monetary damages, including but not limited to back pay and front pay; loss of future benefits; and noneconomic damages, including emotional distress, humiliation, embarrassment, and mental anguish.

## PRAYER FOR RELIEF

Wherefore, based on the above-stated claims, Plaintiffs demand a trial by jury and that the following relief be granted:

A. Back pay, front pay, and lost benefits.

B. Compensatory damages to the extent allowed by law.

C. Attorneys' fees and costs of litigation.

D. Prejudgment and post-judgment interest at the highest lawful rate.

E.  Such other equitable and monetary relief as the court deems just and proper.

F.  A declaratory judgment that Defendant's actions violated Plaintiffs' statutory and constitutional rights and that Defendant shall refrain from future unlawful discriminatory conduct in its employment practices.

Respectfully submitted the 3rd day of May 2023,

**HKM Employment Attorneys LLP**

*s/Artur Davis*
Artur Davis[2]
ASB-3672-D56A
2024 3rd Ave. North, Suite 307
Birmingham, AL 35203
Direct: 205-881-0935
adavis@hkm.com

*s/Jermaine "Jay" Walker*
Jermaine "Jay" Walker
Georgia Bar No. 142044
3344 Peachtree Road NE, Suite 800
Office #35
Atlanta, GA 30326
Direct: 404-301-4020
jwalker@hkm.com

**Counsels for Plaintiffs**

---

[2]Artur Davis will promptly file for admission *pro hac vice* as an attorney of record in this action. Davis is licensed in the state of Alabama and the District of Columbia.